Ira W. MADISON, Plaintiff–Appellee,

and

United States of America, Intervenor–Plaintiff–Appellee,

v.

Commonwealth of VIRGINIA, Defendant–Appellant,

and

R. Riter, a/k/a R. Ruter, CCS Chairman; Karen Polinsky; Duncan Mills; D.J. Armstrong; Gary Bass, Chief of Operations, CCS; Lewis B. Cei, Defendants.

American Civil Liberties Union of Virginia, Incorporated; The Becket Fund for Religious Liberty; Coalition of Prison Chaplain Associations, Amici Supporting Appellee.

Ira W. Madison, Plaintiff–Appellee,

and

United States of America, Intervenor–Plaintiff–Appellee,

v.

Gary L. Bass, in his official capacity as Chief of Operations of Offender Management Services for the Virginia Department of Corrections; Louis B. Cei, in his official capacity as Special

Programs Manager for the Virginia Department of Corrections; Duncan Mills, in his official capacity as Central Classification Supervisor for the Virginia Department of Corrections; Commonwealth of Virginia, Defendants–Appellants.

American Civil Liberties Union of Virginia, Incorporated; The Becket Fund for Religious Liberty; Coalition of Prison Chaplain Associations, Amici Supporting Appellee.

Nos. 06–6266, 06–6296.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 25, 2006.

Decided Dec. 29, 2006.

**ARGUED:** William Eugene Thro, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellants. Richard H. Menard, Jr., Sidley & Austin, L.L.P., Washington, D.C.; Michael Scott Raab, United States Department of Justice, Civil Division, Appellate Section, Washington, D.C., for Appellees. **ON BRIEF:** Robert F. McDonnell, Attorney General of Virginia, Mark R. Davis, Senior Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellants. Jay T. Jorgensen, Tiffani C. Smith, Jeffrey I. Shulman, Peter C. Pfaffenroth, Sidley & Austin, L.L.P., Washington, D.C., for Appellee Ira W. Madison. Gregory G. Katsas, Acting Assistant Attorney General, John L. Brownlee, United States Attorney, Mark B. Stern, United States Department of Justice, Civil Division, Appellate Section, Washington, D.C., for Appellee United States. Rebecca K. Glenberg, American Civil Liberties Union of Virginia Foundation, Inc., Richmond, Virginia, for American Civil Liberties Union of Virginia, Incorporated, Amicus Supporting Appellee. Anthony R. Picarello, Jr., Derek L. Gaubatz, Roger T. Severino, the Becket Fund for Religious Liberty, Washington, D.C., for The Becket Fund for Religious Liberty and Coalition of Prison Chaplain Associations, Amici Supporting Appellee.

Before WILKINSON, MICHAEL, and DUNCAN, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge WILKINSON wrote the opinion, in which Judge MICHAEL and Judge DUNCAN joined.

## OPINION

WILKINSON, Circuit Judge.

Plaintiff Ira Madison, a Virginia state prisoner, sued the Commonwealth of Virginia and various Virginia Department of Corrections officials claiming, *inter alia,* that his requests for kosher meals were denied in violation of section 3 of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc–1(a) ("RLUIPA"). On an earlier appeal, we held that RLUIPA did not impermissibly advance religion in violation of the Establishment Clause. *Madison v. Riter,* 355 F.3d 310 (4th Cir.2003) [hereinafter *Madison I* ]. Virginia now argues that RLUIPA is unconstitutional because it exceeds Congress' authority under the Spending and Commerce Clauses and also that sovereign immunity bars its application against the States. The district court upheld RLUIPA under the Spending Clause and found that Virginia had waived its immunity.

We hold that RLUIPA is a valid exercise of Congress' spending power and that, because Virginia voluntarily accepted federal correctional funds, it cannot avoid the substantive requirements of RLUIPA. With respect to sovereign immunity, we find that Congress unambiguously conditioned federal funds on a State's consent to suit. Because that condition does not clear-

ly and unequivocally indicate that the waiver extends to money damages, however, the Eleventh Amendment bars Madison's claim for monetary relief against the State. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I.

Plaintiff Madison is an inmate at a Virginia state correctional facility. He is a Hebrew Israelite and member of the Church of God and Saints of Christ headquartered at Temple Beth El in Suffolk, Virginia. Members of Temple Beth El are required to eat a kosher diet and to celebrate Passover.

In July 2000 and again in March 2001, plaintiff informed Virginia correctional officials that his religious beliefs directed him to eat a kosher or "Common Fare" diet. Local prison officials approved both requests, but Central Classifications Services ("CCS"), a Richmond–based agency of the Virginia Department of Corrections, overturned the approval. CCS denied plaintiff's request because it found that the daily regular, vegetarian, and no-pork prison menus afforded plaintiff adequate dietary alternatives. CCS administrators also questioned the sincerity of Madison's religious beliefs and considered Madison's history of disciplinary problems.

In August 2001, Madison brought suit in federal district court claiming that he was being denied kosher meals in violation of section 3 of RLUIPA. This section prohibits prison officials from substantially burdening an inmate's religious exercise unless doing so is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000cc–1(a). Virginia argued that RLUIPA was unconstitutional because it violated the Establishment Clause and because it exceeded Congress' authority under the Spending and Commerce Clauses. *Madison v. Riter*, 240 F.Supp.2d 566, 570 (W.D.Va.2003). The district court ruled that RLUIPA impermissibly advanced religion in violation of the Establishment Clause and dismissed plaintiff's RLUIPA claims. *Id.* at 582. We reversed, finding that "Congress can accommodate religion in section 3 of RLUIPA without violating the Establishment Clause," and remanded for consideration of Virginia's other arguments. *Madison I*, 355 F.3d at 313.

On remand, the district court ruled that RLUIPA is a valid exercise of Congress' Spending Clause power. *Madison v. Riter*, 411 F.Supp.2d 645, 650–54 (W.D.Va. 2006). Accordingly, the court declined to reach Virginia's Commerce Clause challenge. *Id.* at 657. Finally, the district court concluded that, by accepting federal funds, Virginia had waived its sovereign immunity for RLUIPA damages claims. *Id.* at 656.

Pursuant to 28 U.S.C. § 1292(b), the district court certified its rulings on the constitutionality of RLUIPA for interlocutory appeal. *Id.* at 657. Virginia requested and we granted discretionary interlocutory review. *See* 28 U.S.C. § 1292(b) (2000). Virginia also appeals the district court's ruling that Virginia waived its sovereign immunity from RLUIPA damages claims, a final order appealable under the collateral order doctrine. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

## II.

RLUIPA prohibits the States from imposing substantial and unjustified burdens on the religious liberty of state prisoners. 42 U.S.C. § 2000cc–1(a). Congress enacted this statute in the wake of the Supreme Court's decision in *City of*

*Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In that case, the Court ruled that the religious protections mandated by the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq. ("RFRA"), exceeded Congress' remedial power under section 5 of the Fourteenth Amendment. *Boerne*, 521 U.S. at 532–36, 117 S.Ct. 2157. Accordingly, RFRA could not be enforced against the States. *See id.* Following *Boerne*, Congress made findings on the burdens placed on inmates' religious exercise, and "attempted to reinstate" RFRA's religious liberty protections, titling the new statute RLUIPA. *Madison I*, 355 F.3d at 315. This time, Congress relied on its Spending and Commerce Clause authority. *Id.*

The Spending Clause provision at issue in this case, section 3(b)(1), applies RLUIPA's religious liberty provisions whenever a "substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc–1(b)(1). The term "program or activity" includes "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government." *Id.* § 2000d–4a(1)(A). The Virginia Department of Corrections is a state agency that receives federal financial assistance. Virginia insists, however, that RLUIPA cannot be applied to this case because the statute exceeds Congress' Spending Clause authority.

■ The Spending Clause is a "permissible method of encouraging a State to conform to federal policy choices," because "the ultimate decision" of whether to conform is retained by the States—who can always decline the federal grant. *New York v. United States*, 505 U.S. 144, 168, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Congress has "broad power to set the terms on which it disburses federal money to the States." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, — U.S. —, 126 S.Ct. 2455, 2459, 165 L.Ed.2d 526 (2006) (citation omitted). This power is, of course, not unlimited. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, & n. 13, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Because even those congressional directives imposed by Spending Clause inducement shift the federal-state balance, the Supreme Court in *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), placed several restrictions upon Congress' authority to persuade.

■ To be valid, Spending Clause legislation must meet several requirements: (1) " 'the exercise of the spending power must be for the general welfare,' " (2) "the conditions must be stated unambiguously," (3) "the conditions must 'bear some relationship to the purpose of the federal spending,' " (4) the conditions "must not violate some other constitutional command," and (5) " 'the financial inducement offered by Congress must not be so coercive as to pass the point at which pressure turns into compulsion.' " *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491–92 (4th Cir.2005) (quoting *Litman v. George Mason Univ.*, 186 F.3d 544, 552–53 (4th Cir.1999)). We join four of our sister circuits and hold that, because RLUIPA satisfies each of the *Dole* requirements, it fits comfortably within Congress' Spending Clause authority. *See Cutter v. Wilkinson*, 423 F.3d 579, 584–90 (6th Cir.2005); *Benning v. Georgia*, 391 F.3d 1299, 1305–08 (11th Cir.2004); *Charles v. Verhagen*, 348 F.3d 601, 606–11 (7th Cir.2003); *Mayweathers v. Newland*, 314 F.3d 1062, 1066–70 (9th Cir.2002).

A.

■ The first *Dole* restriction is derived from the plain text of the Constitution: an

exercise of the spending power must be in pursuit of "the general welfare." U.S. Const. art. I, § 8, cl. 1. "In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." *Dole*, 483 U.S. at 207, 107 S.Ct. 2793 (citation omitted). Here, Congress sought to protect prisoners' religious liberty from unjustified and substantial burdens, *see Cutter v. Wilkinson*, 544 U.S. 709, 716–17, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), and we have no trouble concluding that RLUIPA's "attempt to protect prisoners' religious rights and to promote the rehabilitation of prisoners falls squarely within Congress' pursuit of the general welfare." *Charles*, 348 F.3d at 607.

### B.

■ The second restriction placed on Congress' spending power—that federally imposed conditions be stated unambiguously—emanates from the very structure of our system of governance. It is a fundamental rule of statutory construction that where "Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460–61, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The clear statement rule is particularly appropriate here because Spending Clause legislation is "much in the nature of a contract." *Arlington*, 126 S.Ct. at 2459 (quoting *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531). "[T]o be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'"

*Id.* States cannot, of course, knowingly accept conditions of which they are unaware or cannot reasonably ascertain. *Id.* Accordingly, it is Congress' burden to "affirmatively impos[e]" a "condition in clear and unmistakable statutory terms." *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 563 (4th Cir.1997) (en banc).

■ To determine whether RLUIPA's obligations apply to the States, we must therefore ask whether the statute "furnishes clear notice regarding the liability at issue in this case." *Arlington*, 126 S.Ct. at 2459. *See also Riley*, 106 F.3d at 563. Here, the plain language of section 3 provides clear notice of RLUIPA's religious liberty protections, stating:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). Congress provided equally clear notice that these conditions apply to State entities that accept federal prison funds. The statutory definition of government includes States and their agencies and departments. *Id.* § 2000cc–5(4)(A). And section 3 applies to "any case in which the substantial burden is imposed in a program or activity that receives Federal financial assistance." *Id.* § 2000cc–1(b)(1). Because RLUIPA "furnishes clear notice regarding the liability at issue" here, *Arlington*, 126 S.Ct. at 2459, there is nothing unfair about holding Virginia to its side of the bargain. Should the conditions prove overly onerous, Virginia need only decline federal correctional funds.

## C.

■ The third Spending Clause restriction requires that conditions on federal grants "bear some relationship to the purpose of the federal spending." *New York*, 505 U.S. at 167, 112 S.Ct. 2408; *see also Dole*, 483 U.S. at 207–08, 107 S.Ct. 2793. This requirement is met here because section 3's conditions are not triggered by the acceptance of education, highway, or other similarly unrelated funds. Instead, the section applies where a State chooses to accept federal prison funding. *See* 42 U.S.C. § 2000cc–1(b)(1).

The Commonwealth nonetheless maintains that "RLUIPA fails the relatedness test" because "there is no apparent federal interest at stake in the operations of state prisons." We disagree. Prisoner rehabilitation and protection of religious liberties are legitimate congressional aims related to federal funding of state prisons. *See, e.g., Cutter*, 423 F.3d at 587; *Benning*, 391 F.3d at 1308; *Charles*, 348 F.3d at 608; *Mayweathers*, 314 F.3d at 1067. For "[s]incere faith and worship can be an indispensable part of rehabilitation." *Cutter*, 423 F.3d at 587 (quoting 146 Cong. Rec. S6678–02, S6689 (statement of Sen. Kennedy)). At bottom, RLUIPA's religious liberty protections not only "bear some relationship" to the federal government's interest in prisoner rehabilitation, but are also "an important part of that process." *Id.*

Virginia takes a narrow view of relatedness. It asserts that while Congress might "direc[t] how a specific appropriation is spent," by, for example, "appropriating money for prison construction and then dictating the size of each individual cell," Congress may not impose program-wide restrictions. The Spending Clause, however, has never required Congress to impose conditions on a grant-by-grant basis. *See Oklahoma v. U.S. Civil Serv. Comm'n*, 330 U.S. 127, 129 n. 1, 67 S.Ct. 544, 91 L.Ed. 794 (1947); *see also Dole*, 483 U.S. at 205, 107 S.Ct. 2793. Needless to say, money is fungible, and since federal funds may directly finance a proscribed activity—here substantial and unnecessary burdens on religious exercise in state prisons—or simply make that activity possible by freeing up other funds, program-wide restraints are permissible. *See Sabri v. United States*, 541 U.S. 600, 605–06, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004). Indeed, we recently rejected a similar Spending Clause challenge to the ADA's "blanket condition" on disability discrimination even though the ADA also applies on a program-wide basis. *See Constantine*, 411 F.3d at 493–94.

## D.

■ *Dole's* fourth limitation recognizes that "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." 483 U.S. at 208, 107 S.Ct. 2793. Virginia argues that RLUIPA's religious liberty protections are an "unconstitutional condition" because Congress may not impose RLUIPA's requirements on the States directly.[1] It is well settled, however, that "objectives not thought to be within Article I's enumerated legislative fields, may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *Dole*, 483 U.S. at 207, 107 S.Ct. 2793 (internal citation and quotation omitted); *New York*, 505 U.S. at 167, 112 S.Ct. 2408. The unconstitutional con-

---

1. Because we hold that the Spending Clause is a valid and sufficient source of congressional power and because Virginia, pursuant to its acceptance of federal prison funding, agreed to RLUIPA's substantive provisions, we need not decide whether RLUIPA exceeds Congress' Commerce Clause power.

ditions doctrine is not "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly." *Dole*, 483 U.S. at 210, 107 S.Ct. 2793. Instead, that bar stands for the "unexceptionable proposition" that the Spending Clause "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* Because RLUIPA does not induce the States to engage in unconstitutional activities, it does not impose an unconstitutional condition. *See Charles*, 348 F.3d at 609–11.

Virginia tries to avoid this long line of precedent by asserting that the Supreme Court's recent opinion in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006), adopted the Madisonian, rather than the Hamiltonian, view of the Spending Clause. As we explained in *Litman v. George Mason University*, 186 F.3d 544, 556 & n* (4th Cir.1999), Alexander Hamilton and James Madison took very different views of the scope of the Spending Clause. Hamilton believed that the Clause embraced "a vast variety of particulars, which are susceptible neither of specification nor of definition," *id.* at n* (citing Alexander Hamilton, Report on Manufacturers (Dec. 5, 1791), *reprinted in* 2 *The Founders' Constitution* 446, 446 (Philip B. Kurland & Ralph Lerner eds., 1987)), while Madison understood it to vest Congress with no additional authority, *id.* (citing Letter from James Madison to Andrew Stevenson (Nov. 27, 1830), *reprinted in* 2 *The Founders' Constitution* 453, 456). Virginia argues, in effect, that *Rumsfeld v. FAIR* adopted Madison's view that the Framers intended to limit the scope of Congress' Spending Clause power to those powers "otherwise bestowed by the constitutional charter." *Id.*

But *Rumsfeld v. FAIR* cannot be read to work such a sea change in existing law. The case *rejected* a Spending Clause challenge. Plaintiff law schools argued that, because the Solomon Amendment's condition—requiring that military recruiters be provided with campus access equal to that provided other recruiters—violated the schools' First Amendment rights, it was an unconstitutional condition. *Id.* at 1303–04. The Court disagreed, finding that the equal access condition did not violate the First Amendment and that, because Congress was free to impose the Solomon Amendment directly pursuant to its Article I powers, it necessarily could impose the condition under the Spending Clause. *Id.* at 1307. The Court, far from limiting Congress' spending authority, confirmed the Hamiltonian view that this power is "arguably greater" than Congress' power to achieve its goals directly. *Id.* at 1306. In any event, we may not overlook decades of clear directives in response to Virginia's claim that the Supreme Court has overruled *sub silentio* its prior precedents. *See Tenet v. Doe*, 544 U.S. 1, 10–11, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005); *State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

■ In somewhat the same vein, Virginia argues that RLUIPA is unconstitutional because it requires the States to provide prisoners with religious accommodations that are not compelled by the Constitution. Nothing in the Spending Clause, however, forecloses Congress from placing conditions on federal funds that reach beyond what the Constitution requires. *See Dole*, 483 U.S. at 205, 107 S.Ct. 2793. In *Dole*, for example, the Court rejected a Spending Clause challenge to a statute that required the States to adopt a minimum drinking age of 21—an age limit wholly absent from constitutional text. *Id.*

### E.

■ *Dole's* final restriction bars coercive financial inducements. Of course, every financial incentive "is in some measure a temptation." *Dole,* 483 U.S. at 211, 107 S.Ct. 2793 (quoting *Steward Mach. Co. v. Davis,* 301 U.S. 548, 589–90, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)). But hard choices do not alone amount to coercion. Rather, the coercion analysis seeks to differentiate between those choices that are truly voluntary and those that are illusory, passing the "point at which pressure turns into compulsion." *Id.* (internal quotation omitted).

Virginia claims that RLUIPA is unconstitutionally coercive because it conditions one hundred percent of federal funding for state prisons on compliance with RLUIPA. But the Virginia Department of Corrections received a mere 1.3% of prison funding from the federal government in 2005. It is difficult to see how even one hundred percent of this tiny fraction could leave the State without a real choice regarding the funds and their conditions. Indeed, Virginia does not even argue that it cannot operate its prisons without the federal monies; instead, it argues a funding statute that threatens to withhold the entirety of a federal grant is per se coercive.

■ To be sure, a Spending Clause statute that conditions an entire block of federal funds on a State's compliance with a federal directive raises coercion concerns. "[F]ederal statutes that threaten the loss of an entire block of federal funds upon a relatively minor failing by a state are constitutionally suspect." *West Virginia v. U.S. Dep't of Health & Human Servs.,* 289 F.3d 281, 291 (4th Cir.2002). At its most basic, however, "the coercion inquiry focuses on the 'financial inducement offered by Congress.'" *Constantine,* 411 F.3d at 494 (quoting *Dole,* 483 U.S. at 211, 107 S.Ct. 2793). A small carrot does not, in other words, "become a club" merely because the entire modest amount is at stake. *See, e.g., Oklahoma v. Schweiker,* 655 F.2d 401, 414 (D.C.Cir.1981) (internal quotation omitted). Where, as here, "Congress has offered relatively mild encouragement to the States," the choice to accept or reject federal funds "remains the prerogative of the States." *Dole,* 483 U.S. at 211, 107 S.Ct. 2793. We are, therefore, hard pressed to find that the Commonwealth's "capacity for free choice was overcome" by the prospect of such limited financial assistance. *See Constantine,* 411 F.3d at 494.

Our discussion of the various *Dole* criteria should not obscure the fact that resolution of Virginia's Spending Clause challenge is straightforward. Congress has a legitimate interest in seeing how federal funds are spent. Congress also has a legitimate interest in protecting the religious freedoms of inmates and in not funding systems that violate them. Congress has made it clear that States accepting its money must conform to RLUIPA's requirements. And, for their part, States are perfectly free to decline funds that amount in their totality to a small fraction of their corrections budgets.

Much of the Commonwealth's argument is devoted to its sovereign authority to operate state prisons and to set religious policies within its borders to the extent not forbidden by the Constitution. That may be true as a general matter, but the argument ignores the fact that one attribute of State sovereignty is the ability to waive it in pursuit of other objectives, in this case pursuit of federal funding. Taken to its logical extreme, the Commonwealth's argument would have us pronounce that State sovereignty is so absolute as to be unwaivable and that the Federal Government, notwithstanding the absence of a waiver, must keep the funds flowing. This

goes well beyond what we can accept. In short, the spending program at issue here leaves intact both the legitimate interests of the Federal and State governments. To strike RLUIPA down on Spending Clause grounds would be an extraordinary assertion of judicial authority.

### III.

Virginia next argues that the district court erred by holding that Virginia knowingly consented to damages actions against the State. Although the conditions of compliance are clearly stated in RLUIPA's text, *see supra* Part II.B, this fact in no way implies that a State has consented to each and every remedy to which it conceivably could be subjected. It is a fundamental construct of our federal system that "[t]he Eleventh Amendment restricts the judicial power under Article III," and also that Article I cannot generally "circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *see also Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 767–68, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002).[2] Indeed, the Constitution "split the atom of sovereignty" into Federal and State governments, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring), thus ensuring that, "[p]ower being almost always the rival of power,"

*The Federalist* No. 28, at 149 (Alexander Hamilton) (Clinton Rossiter ed., 1961), "[t]he different governments will control each other, at the same time that each will be controlled by itself," *The Federalist* No. 51, at 291 (James Madison). Firmly embedded within the Framers' design is the principle that a private party may not file suit against an unconsenting state. *Fed. Maritime Comm'n*, 535 U.S. at 767–68, 122 S.Ct. 1864.

Although principles of dual sovereignty limit Congress' authority to abrogate State immunity, a State may consent to suit. *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529, 15 L.Ed. 991 (1858). This "unremarkable" proposition, *Seminole Tribe*, 517 U.S. at 65, 116 S.Ct. 1114, reflects an exercise, rather than a limitation of, State sovereignty. Thus, a State may waive its immunity by voluntarily participating in a federal spending program provided that Congress has expressed "'a clear intent to condition participation ... on a State's consent to waive its constitutional immunity.'" *Litman*, 186 F.3d at 550 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 247, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)).

Nevertheless, State sovereign immunity is among the Constitution's most foundational principles, *see, e.g., Brown v. N.C. Div. of Motor Vehicles*, 166 F.3d 698, 704 (4th Cir.1999), and we may not "infer that a State's immunity from suit in the

---

2. Because the Eleventh Amendment not only prevents federal court judgments, but also "the indignity of subjecting a State to the coercive process of judicial tribunals," *Puerto Rico Aqueduct*, 506 U.S. at 146, 113 S.Ct. 684, the Amendment is an immunity from suit and "effectively lost if a case is erroneously permitted to go to trial," *id.* at 144, 113 S.Ct. 684. As a result, it is "important to resolve Eleventh Amendment immunity questions as soon as possible after the State asserts its immunity." *Constantine*, 411 F.3d at 482.

In this case, the district court held that RLUIPA waived sovereign immunity for damages suits. *Madison*, 411 F.Supp.2d at 656. Virginia appeals this final order under the collateral order doctrine. *See Puerto Rico Aqueduct*, 506 U.S. at 147, 113 S.Ct. 684 (holding that the States may appeal a district court order denying Eleventh Amendment immunity under the collateral order doctrine). We must, therefore, determine whether and to what extent RLUIPA waives sovereign immunity.

federal courts has been negated," *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). "[T]here can be no consent by implication or by use of ambiguous language." *Library of Congress v. Shaw,* 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (quoting *United States v. N.Y. Rayon Importing Co.,* 329 U.S. 654, 659, 67 S.Ct. 601, 91 L.Ed. 577 (1947)). A waiver must be "unequivocally expressed in statutory text." *See Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). For this reason, general participation in a federal program or the receipt of federal funds is insufficient to waive sovereign immunity. *See Atascadero,* 473 U.S. at 246–47, 105 S.Ct. 3142. Rather, "Congress must make its intention unmistakably clear in the language of the statute." *Hoffman v. Conn. Dep't of Income Maintenance,* 492 U.S. 96, 101, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (plurality) (internal quotation omitted). In this case we must determine whether Congress, in enacting RLUIPA, expressly and unequivocally conditioned federal prison funds on Virginia's consent to suit, and, if so, whether that waiver of sovereign immunity unambiguously includes damages suits.[3]

### A.

■■■■■ We begin with the text of the statute. *See, e.g., Arlington,* 126 S.Ct. at 2459. Section 4(a) of RLUIPA provides that any person may "assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The statute defines "government" to include states, state agencies, and state departments. *Id.* § 2000cc–5. On its face, RLUIPA thus creates a private cause of action against the State, *Madison I,* 355 F.3d at 314, and Virginia cannot be heard to claim that it was unaware of this condition. By voluntarily accepting federal correctional funds, it consented to federal jurisdiction for at least some form of relief. *See Benning,* 391 F.3d at 1306 ("[State] was on clear notice that by accepting federal funds for its prisons, [it] waived its immunity from suit under RLUIPA."). Because "appropriate relief" ordinarily includes injunctive and

**3.** Although plaintiff sued various VDOC officials in their official and individual capacities and requested both damages and injunctive relief, the issue presented here is a narrow one. With respect to plaintiff's requested remedies, the district court decided and Virginia appeals only the court's ruling that Virginia waived its sovereign immunity for damages claims. The district court did not address nor have the parties briefed or argued whether individual damages actions are authorized by RLUIPA. Indeed, this question is not even ripe for appeal—it was neither certified for interlocutory review under 28 U.S.C. § 1292(b) by the district court (like the Spending Clause challenge), *see Madison,* 411 F.Supp.2d at 657, nor the subject of a final order appealable under the collateral order doctrine (like the sovereign immunity ruling), *see Puerto Rico Aqueduct,* 506 U.S. at 147, 113 S.Ct. 684. The district court can address the question of whether RLUIPA permits individual damages actions in the first instance if the issue is presented on remand. As to that question, there is a division of authority. *Compare Gooden v. Crain,* 405 F.Supp.2d 714, 723 (E.D.Tex. 2005) (appearing to hold that RLUIPA does not authorize individual money damages); *Smith v. Haley,* 401 F.Supp.2d 1240, 1246 (M.D.Ala.2005) (same); *Boles v. Neet,* 402 F.Supp.2d 1237, 1241 (D.Colo.2005) (same); *Chase v. City of Portsmouth,* No. Civ. A. 2:05CF446, 2005 WL 3079065, at *5 (E.D.Va. Nov.16, 2005) (same), *with Shidler v. Moore,* 409 F.Supp.2d 1060, 1071 (N.D.Ind.2006) (recognizing RLUIPA claim for individual monetary relief); *Charles v. Verhagen,* 220 F.Supp.2d 937, 953 (W.D.Wis. 2002) (same); *Daker v. Ferrero,* No. 1:03–CV–02481–RWI, 2006 WL 346440, at *8 (N.D.Ga. Feb.13, 2006) (same); *Orafan v. Goord,* No. 00CV2022, 2003 WL 21972735, at *9 (N.D.N.Y. August 11, 2003) (same).

declaratory relief, *see, e.g., Shea v. County of Rockland*, 810 F.2d 27, 29 (2d Cir.1987), Madison's claims for equitable relief are not barred by the Eleventh Amendment.

### B.

That RLUIPA unambiguously conditions federal prison funds on a State's consent to suit, however, does not end our inquiry. Congress is, of course, free to condition funds upon a waiver of "sovereign immunity against liability without waiving [a State's] immunity from monetary damages awards." *See Lane*, 518 U.S. at 196, 116 S.Ct. 2092; *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 32–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). *See also* Administrative Procedure Act, 5 U.S.C. § 702 (2000) (waiving Federal sovereign immunity for "relief other than money damages"). And "[a] waiver of sovereign immunity for some type of remedy does not necessarily extend to suits for damages." *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1025 (D.C.Cir. 2006).

In analyzing whether a sovereign has waived its immunity, we strictly construe the scope of any alleged waiver in favor of the sovereign. *Lane*, 518 U.S. at 192, 116 S.Ct. 2092. We may "not enlarge the waiver beyond what the language requires." *Shaw*, 478 U.S. at 318, 106 S.Ct. 2957 (internal citations and quotations omitted). Consent to suit is never implied. *See Atascadero*, 473 U.S. at 247, 105 S.Ct. 3142. And ambiguities are construed in favor of immunity. *Nordic Vill.*, 503 U.S. at 34, 112 S.Ct. 1011. In short, "[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane*, 518 U.S. at 192, 116 S.Ct. 2092; *see also Nordic Vill.*, 503 U.S. at 34, 112 S.Ct. 1011. It is of no moment that some of the

cases in this area involve the question of whether Congress has waived federal sovereign immunity, because "[i]n considering whether the Eleventh Amendment applies ... cases involving the sovereign immunity of the Federal Government ... provide guidance." *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 506, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998).

The Supreme Court's decision in *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), is telling. At the time the case was decided, Section 106(c) of the Bankruptcy Code provided, "[N]otwithstanding any assertion of sovereign immunity ... a determination by the court of an issue arising under [a provision of the Bankruptcy Code that applies to governmental units] binds governmental units." *Id.* at 32, 112 S.Ct. 1011. The Court held that section 106(c) of the Bankruptcy Code did not waive federal sovereign immunity for monetary relief. *Id.* at 39, 112 S.Ct. 1011. The Court noted that although section 106(c) waived sovereign immunity for some claims and could be interpreted to provide for money damages, it could also be read to preclude them. *Id.* at 34–37, 112 S.Ct. 1011. As a result, section 106(c) did not contain the "unequivocal textual waiver" required to waive sovereign immunity for monetary relief. *Id.* at 39, 112 S.Ct. 1011.

We conclude that RLUIPA's "appropriate relief against a government" language falls short of the unequivocal textual expression necessary to waive State immunity from suits for damages. *See id.* The statute makes no reference to monetary relief—or even to sovereign immunity generally. And, like the Bankruptcy Code provision at issue in *Nordic Village*, "appropriate relief" is "susceptible to more than one interpretation." *Webman*, 441 F.3d at 1026. That is, although "appropriate relief" might be read to include dam-

ages in some contexts, it is at least equally plausible that, in other contexts, the term might be read to preclude them. *See id.* In *Webman v. Federal Bureau of Prisons,* 441 F.3d 1022, 1026 (D.C.Cir.2006), the D.C. Circuit recently held RFRA's identical "appropriate relief" provision insufficient to waive federal sovereign immunity for damages suits. The court noted that, "RFRA's reference to 'appropriate relief' is not the 'sort of unequivocal waiver that our precedents demand.'" *Id.* (quoting *Lane,* 518 U.S. at 198, 116 S.Ct. 2092). Rather, because the *Webman* court found RFRA's "appropriate relief against a government" text to be ambiguous, "open-ended[,] and equivocal," it concluded that such language could not effect a waiver of sovereign immunity. *Id.*

Had Congress wished to effect a State's waiver of Eleventh Amendment sovereign immunity from suit for damages as a consequence of accepting federal funds, it could easily have expressed that intention. In the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(2) (2000), for instance, Congress crafted a clear waiver of federal sovereign immunity from monetary relief. The Act provides for federal jurisdiction and permits a "complaining party [to] recover compensatory ... damages" from, *inter alia,* government actors. *Id.*

While particular phrasing may not be necessary to waive sovereign immunity for damages, an unequivocal textual waiver of immunity that "extend[s] unambiguously to such monetary claims" is. *See Lane,* 518 U.S. at 192, 116 S.Ct. 2092. Thus the fact that "appropriate relief" is open-ended forecloses any argument that the statute waives immunity for monetary relief. *Nordic Vill.,* 503 U.S. at 37, 112 S.Ct. 1011; *see also Webman,* 441 F.3d at 1026; *Riley,* 106 F.3d at 566.

Plaintiff insists that, even if RLUIPA's "appropriate relief" language does not contain the requisite "unequivocal textual waiver," the Civil Rights Remedies Equalization Act of 1986, 42 U.S.C. § 2000d–7 ("CRREA"), does. That statute provides, in part:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d–7(a)(1). While plaintiff is correct that the CRREA clearly and unambiguously conditions the receipt of federal funds on a waiver of State sovereign immunity, *Litman,* 186 F.3d at 554, and that this waiver sometimes includes damage remedies (where available against a private party), 42 U.S.C. § 2000d–7(a)(2), the CRREA does not clearly and unambiguously apply to RLUIPA. Indeed, the CRREA makes no mention of RLUIPA.

Nevertheless, plaintiff claims that the CRREA's catch-all provision waives sovereign immunity here. Again, we disagree. Even if a catch-all provision could suffice as an "unequivocal textual waiver" (and we do not decide that it does), the catch-all provision here—"any other Federal statute prohibiting discrimination"—does not. Every statute set out in the CRREA expressly prohibits discrimination. 29 U.S.C. § 794(a) (2000) (prohibiting "discrimination" on the basis of disability); 20 U.S.C. § 1681(a) (2000) (prohibiting "discrimination" on the basis of sex); 42 U.S.C. § 6102 (2000) (prohibiting "discrimination" on the basis of age); 42 U.S.C. § 2000d (2000) (prohibiting "discrimina-

tion" on the basis of race, color, or national origin).

To fit within the CRREA's sovereign immunity waiver pursuant to its catch-all provision—"other Federal statute prohibiting discrimination"—RLUIPA must be like the statutes expressly listed. Under the "established interpretative canons of *noscitur a sociis* and *ejusdem generis,* where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,* 537 U.S. 371, 384, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (alteration and internal quotation omitted). At a minimum, this would seem to require that a statute be aimed at discrimination. But RLUIPA does not speak in those terms. Instead, it forbids a state from imposing substantial and unjustified religious burdens on prisoners. And, in contrast to the non-discrimination statutes listed in the CRREA—which require identical treatment of similarly situated individuals— RLUIPA requires that States treat religious accommodation requests more favorably than non-religious requests. In view of these differences, we cannot say that the CRREA's catch-all provision is a "clear, unambiguous, and unequivocal" waiver. *Litman,* 186 F.3d at 554. In sum, it is not clear that RLUIPA is a "Federal statute prohibiting discrimination" and ambiguity again defeats plaintiff's claim that Virginia, by accepting federal funds, knowingly consented for damages actions to be brought against it.

## IV.

Our analysis of Virginia's challenge to RLUIPA begins and ends with first principles. It is axiomatic that "a healthy bal-

ance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory,* 501 U.S. at 458, 111 S.Ct. 2395. Because dual sovereignty plays a vital role in our federal system and because the Spending Clause can alter the constitutional balance between the Federal government and the States, courts have insisted that "recipients of federal funds must accept them 'voluntarily and knowingly.'" *Arlington,* 126 S.Ct. at 2459 (quoting *Pennhurst,* 451 U.S. at 17, 101 S.Ct. 1531).

Here, the plain language of RLUIPA provides "clear notice" of its religious liberty protections—a condition that Virginia voluntarily accepted by receiving federal correctional funds. Likewise, RLUIPA plainly creates a cause of action against the States and we find that Congress unambiguously conditioned federal funds on a State's consent to suit. However, nothing in the Supreme Court's or this court's decisions afford any support for the proposition that language as oblique as that in RLUIPA and the CRREA (as applied to RLUIPA) is sufficient to effectuate a waiver of immunity from suit for money damages from the State—indeed, the United States does not argue the point. We thus conclude that the Eleventh Amendment bars plaintiff's damages claim against the State. For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and the case is remanded for proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*